## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| Doctors Hospital of Hyde Park, Inc., | ) | Bankruptcy No. 11 B 11520 |
| Debtor. | ) | Chapter 11 |
| | ) | |
| Gus A. Paloian, Chapter 11 Trustee of | ) | |
| Doctors Hospital of Hyde Park, Inc., | ) | |
| Counter-Claimant, | ) | |
| | ) | |
| v. | ) | Adversary No. 11 A 01983 |
| | ) | |
| LaSalle Bank National Association, | ) | |
| f/k/a LaSalle National Bank, as Trustee for | ) | |
| Certificate Holders of Asset Securitization | ) | |
| Corporation Commercial Pass-Through | ) | |
| Certificates, Series 1997, D5, by and through | ) | |
| its servicer, Orix Capital Markets, LLC | ) | |
| Counter-Claim Defendant. | ) | |

## OPINION ON SUMMARY JUDGMENT MOTION OF
## COUNTER-CLAIMANT PALOIAN ON COUNT I

This Adversary Complaint is pleaded by the Chapter 11 Trustee as a counterclaim to

assert defenses and offsets to a claim filed by Counterclaim Defendant against the bankruptcy

estate.

Gus A. Paloian as Trustee for the bankruptcy estate of Doctors Hospital of Hyde Park,

Inc. ("Paloian" or "Trustee") has moved, pursuant to Rule 7056 Fed. R. Bankr. P. for summary

judgment on Count I of the Counterclaim.  He seeks judgment declaring and adjudging that the

claim filed in the Doctors Hospital bankruptcy case by LaSalle Bank National Association [f/k/a

LaSalle National Bank as Trustee for Certificate Holders of Asset Securitization Corporation

Commercial Mortgage Pass-Through Certificates, Series 1997, D5, by and through its Servicer,

Orix Capital Markets, LLC] (hereinafter "LaSalle") is offset to the extent of recovery by it from a third party in assertedly related litigation.

## INTRODUCTION

In 2000, LaSalle filed a $60 million claim against the Debtor's Estate for the principal balance and other amounts allegedly due on a loan guaranteed by the Debtor. At the same time LaSalle filed suit in a New York District Court to recover damages from Nomura Asset Capital Corporation ("Nomura"), the party who had assigned the loan to LaSalle. That suit was based on provisions in the assignment contract. In July 2006, LaSalle received $67.5 million from Nomura in settlement of the New York Litigation.

The debts claimed due in LaSalle's bankruptcy Proof of Claim are asserted in Count I of the Trustee's Counterclaim to be the same as LaSalle has already recovered in its settlement with Nomura. Movant argues that LaSalle's only damage sought in the New York case was thereby recovered in the litigation settlement, namely the principal balance, interest, and other amounts due on the mortgage loan. Movant argues that LaSalle seeks to recover those very claims a second time by its pending claim against the bankruptcy estate.

The following history is detailed and expanded on in the Undisputed Facts set forth below.

When the borrower on the Nomura Loan HPCH, LLC ("HPCH") stopped making payments on the loan, LaSalle was thereby injured in the amount of the loan that was unpaid. It sought to recover in three ways. First, it filed a claim against Doctors Hospital's bankruptcy estate based on the hospital's guaranty of the loan. Second, it filed foreclosure proceedings against the real estate owned by the loan borrower. Third, LaSalle sued Nomura who had sold it the loan, asserting in the New York suit that Nomura had breached representations made about

quality of the loan. The remedy LaSalle sought from Nomura was damages in the amount of the "repurchase price" of the loan, specifically defined in the assignment contract as an amount equal to the total of loan principal, interest, and related fees. Just as LaSalle's Proof of Claim against the bankruptcy estate sought to remedy its financial loss on the loan, LaSalle's suit against Nomura sought to recover for that same injury. That is why LaSalle, having recovered from Nomura on its Complaint seeking the same recovery, is said to be improperly seeking a double recovery by continuing to pursue its Proof of Claim for collection once again of its claim against the bankruptcy estate that was already paid to it in the settlement.

As applicable state law prohibits a party from seeking a double recovery on the same claim, the Trustee argues that Summary Judgment should offset LaSalle's recovery in the New York case against LaSalle's claim against the bankruptcy estate. As a party to a general release may release others against whom the party has the same claim, it is also argued that the General Release signed by LaSalle in the Settlement also released its Proof of Claim.

The Counterclaim is pleaded in nineteen counts. Only Count I is involved in the Motion for Summary Judgment. As originally presented, it relied on authority allowing only a "single recovery," authority applicable under both New York and Illinois law. It asserted that LaSalle's Proof of Claim against the bankruptcy estate "should therefore be reduced by the funds and other considerations it received in a settlement of its claims against Nomura in the Nomura Litigation and by any other recoveries that it has received or will received . . .." Count I of the Trustee's Counterclaim prays for entry of judgment "offsetting the amounts received in the Nomura Settlement or otherwise received by Nomura in connection with the Nomura Loan against the amount claimed in the Proof of Claim and granting such other and further relief as is just and proper."

3

The issues initially briefed presented issues that invited consideration of the possible application of non-bankruptcy law holding that giving a general release to a party may release other parties having the same claim. Since the parties had not discussed that precedent, an order (Dated April 10, 2013, Docket No. 84) requested briefing on that issue, and that was done.

No motion is pending under Counts XV and XVI of the Counterclaim that contest portions of the LaSalle claim against the bankruptcy estate. As determined hereinbelow, Paloian is entitled to summary judgment whereby the Nomura settlement payment that was received by LaSalle will be held to offset any valid elements of loan debt claimed by it in the Proof of Claim filed against the bankruptcy estate. Counts XV and XVI and the Claim itself will be set for trial to adjudicate the challenges to the contested elements of the Proof of Claim and to determine whether any net balance is due on the Proof of Claim after crediting the Settlement.

## JURISDICTION AND VENUE

Jurisdiction lies under 22 U.S.C. § 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(c),(k), and (o). Even if it were not core, or if questions under the Constitution as to authority of a bankruptcy judge to enter final judgment might have been considered under *Stern v. Marshall*, 131 S. Ct. 2594 (2011), the parties expressly consented to entry of final judgment by a bankruptcy judge (Docket Nos. 26 and 27) and such consent would, if necessary, moot any such Constitutional issues that might have been raised by *Stern*. *In re Olde Prairie Block Owner, LLC*, 457 B.R. 692, 699 (Bankr. N.D. Ill. 2011).

Venue is based on 28 U.S.C. §§ 1408 and 1409.

## UNDISPUTED FACTS

### *Introduction*

From submissions of the parties under Local Bankruptcy Rule 7056-1 [pursuant to Rule

7056 Fed. R. Bankr. P.], the following undisputed facts have been demonstrated:

1.        On August 28, 1997, Nomura loaned the principal amount of $50 million to

HPCH, LLC ("HPCH") the owner of the real property where the Debtor operated a hospital.

(App. 1, ¶ 70) As more fully detailed below, the loan was secured by a mortgage on that property

and the Debtor's guaranty. (*Id.*) In October 1997, Nomura transferred all of its rights in the

Nomura Loan to Asset Securitization Corporation, which in turn transferred its rights to LaSalle.

(App. 2, Stipulated Facts ¶ 37)

2.        In April 2000 Debtor filed its Chapter 11 petition and shortly thereafter ceased

operations.  Because HPCH's only source of income was the Debtor's rental payments, and the

Debtor had stopped making those payments, HPCH was no longer able to make payments on the

Nomura Loan, and LaSalle declared a default.  LaSalle then filed a mortgage foreclosure suit

against HPCH and a claim in the bankruptcy proceeding based on the Debtor's guaranty of the

Nomura Loan.  LaSalle's filed claim was broken down as follows (as detailed in its claim filed

in the bankruptcy case):

| | |
|---|---|
| Principal | $47,856,102.39 |
| Accrued Interest 3/11/00 to 4/17/00 at $12,854.68 per diem | $475,623.16 |
| Default Interest from 3/31/00 to 4/17/00 at $19,501.36 per diem | $351,024.48 |
| Yield Maintenance Premium | $13,111,986.00 |
| Travel/Inspection Expense | $1,745.54 |

| Less Unapplied Funds | ($1,505,518.83) |
|---|---|
| Less Escrow Balance | ($188,054.50) |
| Net Total Claim | $60,102,908.24 |

(App. 3)

That claim has not been amended.

3.     In 2000, LaSalle sued Nomura in the United States District Court for the Southern District of New York (the "New York Litigation") (App. 5) with allegations discussed hereinbelow.  In that suit, LaSalle sought to recover the "Repurchase Price" defined in discussion below.

4.     In their agreement effective July 18, 2006, LaSalle and Nomura settled the New York Litigation (the "Settlement").  The agreement provided that LaSalle would receive a payment of $67,500,000 from Nomura in settlement, but the Settlement Agreement did not state how that sum was computed or arrived at.  (App. 6)  LaSalle has admitted that it received payment of that Settlement amount.  (App. 7, ¶ 23)

5.     Paloian filed a Second Amended Objection to LaSalle's claim on March 16, 2011. (App. 4) That Objection asserted several grounds for denying the claim, including:

> 11.  The amount of the Trust's claim should be reduced by funds and other consideration it received in a settlement of its claims against Nomura in *LaSalle as Trustee v. Nomura Asset Capital Corporation* 00 CIV 8720 (S.D.N.Y.), by any other recoveries that it has received or will receive, and by the sale of certain real estate owned by HPCH.

6.     In 2002, Paloian filed an Adversary Complaint against LaSalle and several others seeking recovery of funds for the Estate on various theories (Adversary No. 02 A 00363).

(App. 8) As to LaSalle, Paloian sought to void the Debtor's guaranty and the liens securing that

guaranty, and to recover certain payments of rent as fraudulent transfers.

  7.  In 2003, LaSalle filed an Amended Answer to Paloian's Adversary Complaint,

No. 02 A 00363.  (App. 9)  It contained several counterclaims and a third-party claim against

Nomura.  In that third-party claim LaSalle sought to recover "Repurchase Price" as defined

below.

***Nomura's $50 Million Loan to HPCH, LLC
Was Guaranteed by Doctors Hospital***

  8.  On August 28, 1997, Nomura  loaned the principal amount of $50,000,000 to

HPCH, LLC, an affiliate of Doctors Hospital (the "HPCH  Loan"), pursuant to a Promissory

Note made, executed and delivered by HPCH, LLC in favor of Nomura (the "HPCH Promissory

Note").  HPCH, LLC is the owner of the real estate from which Doctors Hospital operated the

hospital (the "Hospital Real Estate").  The obligations of HPCH, LLC under the HPCH Loan and

HPCH Promissory Note were secured by, *inter alia,* the Hospital Real Estate and other personal

property of Doctors Hospital [Plaintiff's Appx. 1 (Joint Stip, Jt. Ex 202;¶ 70)].[1]

  9.  In connection with the HPCH Loan, Doctors Hospital executed a Guaranty and

Suretyship Agreement in favor of Nomura  (the "Doctors Hospital Guaranty").  Pursuant to the

Doctors Hospital Guaranty, Doctors Hospital became surety to Nomura for the HPCH Loan  and

secured its obligations pursuant to, *inter alia,* an Operator Security and Pledge Agreement

[Plaintiff's Appx. 1 (Joint Stip, Jt. Ex 202; ¶¶ 73, 75)].

---

  [1] References to "[Trustee's Appx. _ ( ___)]."are to tabbed documents in Trustee's Appendix to its 7056-1 Statement in support of his Setoff Motion. In lieu of duplicating these tabbed documents, Counter-Claim Defendant references Trustee's Appendix where applicable,  and includes in its 7056-2 Appendix only documents not made a part of Trustee's Appendix. Defendant refers to the Appendix to Defendant's 7056-2 Response and Counter Designation as Defendant's Appx. _  (__)]."

7

*Nomura Sold and Securitized the HPCH Loan*
*Pursuant to a Mortgage Loan Purchase and*
<u>*Sale Agreement and a Pooling and Servicing Agreement*</u>

10.     On October 24, 1997, Nomura, as seller, sold and transferred all of its rights, title

and interests in and to the HPCH Loan, together with over 100 other loans (collectively, the

"Mortgage Loans"), to Asset Securitization Corporation ('ACS") pursuant to a Mortgage Loan

Purchase and Sale Agreement (the "MLPSA"). [Plaintiff's Appx. 1 (Joint Stip. Jt. Ex. 202;

¶¶ 100, 101)].

11.     Contemporaneously with the execution of the MLPSA, ACS, LaSalle as Trustee,

and others entered into a Pooling and Servicing Agreement (the "PSA"), also dated October 24,

2997.  In the PSA, ACS, as "Depositor", conveyed to LaSalle as Trustee, *inter alia*, all of its

right title and interest in the Mortgage Loans that Nomura had conveyed to ACS under the

MLPSA. [Plaintiff's Appx. 1 (Joint Stip, Jt. Ex 202; ¶¶ 105, 106)].

12.     In the MLPSA, Nomura acknowledged that the sale of the Mortgage Loans

(which included the HPCH Loan) was made in connection with the formation of a REMIC Trust

(the "Trust").  The MLPSA further acknowledged that LaSalle Bank National Association (f/k/a

LaSalle National Bank ("LaSalle as Trustee") would be trustee of the Trust. [Defendant's Appx.

1 (MLPSA ¶ 3[c])].

13.     AMRESCO Management, Inc. was the original "Special Servicer" of the Trust

under the PSA. [Defendant's Appx. 2 (Affidavit of R. Farrington ¶ 9)].

14.     Lend Lease Asset Management, L.P. was a successor Special Servicer to the

Trust. [Plaintiff's Appx. 5 (First Amended Complaint at pp. 17)].

15.     ORIX Capital Markets, LLC is now the Special Servicer of the Trust [Plaintiff's

Appx. 1 (Joint Ex. 202 ¶ 109)].

### *Nomura Made Express Representations and Warranties*
### *for Benefit of LaSalle as Trustee and*
### *Certificate Holders of the Trust in the MLPSA and PSA*

16.     In the MLPSA, Nomura made forty-three separate representations and warranties

(the "Representations and Warranties") regarding the Mortgage Loans. [Defendant's Appx. 1

(MLPSA pp. 2-18)].

17.     Nomura's following Representations and Warranties were pleaded and relied on

by LaSalle's Complaint in the now settled New York litigation:

> "[w]" with respect to each Mortgage Loan originated by [Nomura], no fraudulent
> acts were committed by [Nomura] during the origination process of such
> Mortgage Loan and the origination, servicing and collection of each Mortgage
> Loan is in all respects legal, proper and prudent in accordance with customary
> industry standards." (The "Origination Warranty") [Defendant's Appx. 1
> (MLPSA, 2(b)(xix))];

> each Mortgage Loan "is directly secured by a Mortgage [as defined in the
> MLPSA] on a commercial property or multifamily residential property" and that
> "the fair market value of such real property as evidenced by an [appraisal by a
> member of the Appraisal Institute] conducted within 12 months of the origination
> of the Mortgage Loan, was at least equal to 80% of the principal amount of the
> Mortgage Loan" either at the time the loan was originated, or at the time the same
> of the mortgages closed." (the "Eighty Percent Warranty") [Defendant's Appx. 1
> (MLPSA, ¶ 2(b)(xxix))]; and

> "[e]ach mortgage Loan constitutes a 'qualified mortgage' within the meaning of
> Section 860G(a)(3) of the Internal Revenue Code (but without regard to the rule
> in Treasury Regulations 1.860G-2(f)(2) that treats a defective obligation as a
> qualified mortgage, or any substantially similar successor provision" (the
> "Qualified Mortgage Warranty") [Defendant's Appx. 1 (MLPSA, ¶ 2(b)(xxxi))].

18.     All of Nomura's Representations and Warranties were made for the benefit of,

and could be enforced by or on behalf of, LaSalle as Trustee or the certificate holders of the

Trust to the same extent that ASC had rights against Nomura in respect of the Representations

and Warranties under the MLPSA, and those Representations and Warranties survived until

termination of the PSA. [Defendant's Appx. 1 (MLPSA ¶ 8)].

19.     The MLPSA also provided that within 90 days following receipt of notice of a

breach of the Representations and Warranties, Nomura would either (1) repurchase the related

Mortgage Loan; or (2) promptly cure such breach in all material respects. [Defendant's Appx. 1

(MLPSA ¶ 3(b))].

*LaSalle as Trustee Claimed that Nomura*
*Breached Representations and Warranties;*
*It Demanded Cure or Repurchase of the HPCH*
<u>*Loan, and Ultimately Initiated Litigation Against Nomura*</u>

20.     In January of 2001, LaSalle as Trustee through Lend Lease Asset Management,

L.P., as Special Servicer, filed a First Amended Complaint against Nomura and ASC in the

United States District Court for the Southern District of New York, designated Case No.

00 CIV8720 (the "New York Litigation"). [Plaintiff's Appx. 5 (First Amended Complaint)].

21.     The First Amended Complaint in the New York Litigation consisted of six

counts. Counts I-IV were against Nomura or ASC for asserted breaches of representation of

warranties under the MLPSA and PSA; Count V was against ASC asserting falsity of Nomura's

representations and warranties; and Count VI was against both defendants for attorneys fees

under certain applicable statutory and contractual provisions. [Plaintiff's Appx. 5 (First

Amended Complaint)].

22.     The First Amended Complaint in the New York case asserted that:

•       Lend Lease Asset Manager, LP, Special Servicer to LaSalle as Trustee at
        the time ("Lend Lease"), had reviewed the original appraisal for the
        Hospital Real Estate and concluded that Nomura had breached the Eighty
        Percent Warranty with respect to the HPCH Loan. Accordingly, Lend
        Lease demanded that ASC repurchase the HPCH Loan within 90 days at
        the "Repurchase Price", as defined in the PSA. [Plaintiff's Appx. 5 (First
        Amended Complaint at ¶ 13)].

- ASC refused to repurchase the Mortgage Loan; asserted that the Eighty Percent Warranty had not been breached; and submitted a revised appraisal. [Plaintiff's Appx. 5 (First Amended Complaint at ¶ 14)].

- Lend Lease replied to ASC that the revised appraisal was insufficient, and that Nomura had also breached the Origination Warranty and the Qualified Mortgage Warranty. [Plaintiff's Appx. 5 (First Amended Complaint at ¶ 15)].

- By letter dated August 4, 2000, Nomura and ASC refused to repurchase the HPCH Loan and denied that any of the Representations and Warranties had been breached. [Plaintiff's Appx. 5 (First Amended Complaint at ¶ 16)].

The six Counts of the First Amended Complaint asserted several theories:

Count I - Nomura Capital breached its representation and warranty that the Mortgage Loan was a "qualified mortgage."

Count II - Nomura Capital breached its representation and warranty that the Mortgage Loan was at least 80% secured by real property.

Count III - Asset Securitization Corporation ("ASC") breached its representation and warranty that the Mortgage Loan was at least 80% secured by real property.

Count IV - Nomura Capital breached its representation and warranty that property and prudent underwriting standards were used in connection with the Mortgage Loan.

Count V - ASC breached its representation and warranty regarding truth of Nomura Capital's representations and warranties.

Count VI - Requested attorneys' fees.

While the first five Counts of the First Amended Complaint asserted different theories,

the prayers for relief in Counts I through V were the same:

"Plaintiff seeks damages equal to the Repurchase Price as scheduled in accordance with relevant provisions of the PSA. As of November 2, 2000, the Repurchase Price equal $56,643,016.06 plus legal fees and expenses with additional amounts continuing to accrue in accordance with the PSA."

11

The "Repurchase Price" was defined in, the Priority and Finance Agreement ("PSA") as

follows:

> "Repurchase Price": With respect to any Mortgage Loan to be repurchased
> pursuant to Section 2.03(d), 2.03(e), or 9.01, or any Specially Serviced
> Mortgaged Loan or any REO Mortgage Loan to be sold or repurchased pursuant
> to Section 3.18 an amount calculated by the Servicer, equal to: (i) the unpaid
> principal balance of such Mortgage Loan as of the Due Date as to which a
> payment was last made by the Borrower (less any Advances previously made on
> account of principal); plus (ii) unpaid accrued interest from the Due Date as to
> which interest was last paid by the Borrower up to the Due Date in the month
> following the month in which the purchase or repurchase occurred at a rate equal
> to the Mortgage Rate on the unpaid principal balance of such Mortgage Loan
> (less any Advances previously made on account of interest); plus (iii) any
> reimbursed Advances and unpaid Servicing Fees, Trustee Fees and Special
> Servicing Compensation allocable to such Mortgage Loan together with interest
> thereon at the Advance Rate; plus (iv) in the event that the Mortgage Loan is
> required to be repurchased pursuant to Sections 2.03(e) or 2.03(e), expenses
> reasonably incurred or to be incurred by the Servicer, the Special Servicer or the
> Trustee in respect of the breach or defect giving rise to the repurchase obligation,
> including any expenses arising out of the enforcement of the repurchase
> obligation. (Emphasis supplied.)

By suing for the "Repurchase Price," LaSalle thereby sought to recover the (1) principle

balance, (2) unpaid accrued interest, (3) advances, fees, and servicing compensation, and

(4) repurchasing expenses, if any.

23.    On cross motions for summary judgment, the District Court in the New York

Litigation concluded that: (1) the Eighty Percent Warranty and the Qualified Mortgage Warranty

were essentially the same; (2) Nomura had qualified for the "safe harbor" provision of the

Qualified Mortgage Warranty; (3) even if Nomura had not satisfied the safe harbor

requirements, Nomura had cured the breach; and (4) Nomura had not breached the Origination

Warranty. *See LaSalle Bank National Assoc. v. Nomura Asset Capital,* 424 F.3d 195, 198-199

(2nd Cir. 2005).

24.     On appeal, the Second Circuit Court of Appeals affirmed in part, vacated in part, and remanded (the "Second Circuit Decision"). The Second Circuit opinion held: (1) the Eighty Percent Warranty and the Qualified Mortgage Warranty were not essentially the same; (2) Nomura could not invoke the "safe harbor" provision of the Qualified Mortgage Warranty; (3) Nomura had not properly cured its breach of the Eighty Percent Warranty or the Qualified Mortgage Warranty; and (4) Nomura did not breach its Origination Warranty. *Id.* at 199.

### Settlement Between LaSalle as Trustee and Nomura

25.     Prior to trial on the issues remanded by the Second Circuit Decision, LaSalle as Trustee and Nomura agreed upon a settlement, the terms of which are memorialized in a Settlement Agreement and Mutual Release (the "Settlement Agreement")[2] Material terms of the Nomura Settlement included the following:

- Nomura paid the Trust the sum of $67.5 million;
- LaSalle as Trustee was to continue the foreclosure action regarding the Hospital Real Estate previously initiated in Illinois state court. LaSalle as Trustee agreed that it would either (a) credit bid $10.1 million at the foreclosure sale, and if successful, execute a quitclaim deed to the Hospital Estate in favor of Nomura; or (b) sell the Hospital Real Estate for a price in excess of $10.1 million and remit sale proceeds to Nomura; and
- All claims made, or which could have been made, in the New York Litigation were released; (Emphasis supplied.)

[Plaintiff's Appx. 6 (Settlement Agreement)].

In negotiating the Settlement Agreement, LaSalle (through ORIX, as its Special Servicer) now argues that it "took into consideration," *inter alia*, the (1) the fees and costs associated with

---

[2] The *Settlement Agreement and Mutual Release* was originally confidential pursuant to the Stipulated Protective and Restricting Order Governing Confidential Information entered by this Court July 12, 2011 [Docket No. 1477 in the Doctors Hospital bankruptcy case]. As such, Defendant did not originally file this document with the Court's ECF system. However, the confidentiality order was since vacated by agreement, and the document was included in the Trustee's Appx. as Tab 6 in the courtesy copies delivered to Chambers.

defending Adversary NO. 02-363 in this bankruptcy case; ;and (2) the prospects of obtaining

repayment on the HPCH Promissory Note and the Doctors Hospital Guaranty which it retained

pursuant to the settlement.  It argues that the decision to enter into the Settlement Agreement was

conditioned upon its right to retain and enforce the HPCH Loan and the Doctors Hospital

Guaranty to the fullest extent and without any application of the settlement proceeds to the

obligations arising thereunder, though it can point to no provisions in the Settlement Agreement

saying that.  Negotiations leading up to the Settlement Agreement were said by an affidavit to

have assumed that the cash component of the Settlement Agreement was not intended to be a

credit toward the outstanding obligations owing under the HPCH Loan or the Doctors Hospital

Guaranty. [Defendant's Appx. 3, (Affidavit of G. May, ¶¶ 6-8)].  May works for ORIX and as

Debtor's General Counsel personally negotiated the Settlement Agreement and Mutual Release.

He gave his substantive views in three paragraphs of his affidavit filed as part of LaSalle's

opposition to Summary Judgment:

> "6.    Pursuant to the Settlement Agreement, Nomura did not repurchase
> the HPCH Loan from the Trust, and the Settlement Agreement
> does <u>not</u> provide for the Settlement Proceeds to be applied as a
> credit toward the outstanding obligations owing under the HPCH
> Loan, or any other obligations of any party arising thereunder.
> Similarly, negotiations leading up to the Settlement Agreement
> contemplated that the Settlement Proceeds were <u>not</u> intended to be
> a credit toward the outstanding obligations owing under the HPCH
> Loan, or any other obligations of any party arising thereunder.

> 7.    One of the reasons the Settlement Agreement expressly provided
> for LaSalle as Trustee to retain its rights in and to the HPCH Loan
> is because LaSalle as Trustee (through ORIX, as its Special
> Servicer) was intimately familiar with (a) Trustee's litigation to
> avoid the Doctors Hospital Guaranty and recover allegedly
> fraudulent transfers in the adversary case designated number 02 A
> 363 (the "Fraudulent Transfer Case"); and (b) the Trust's actions
> to enforce the Doctors Hospital Guaranty.

8.    In approving the Settlement Agreement, LaSalle as Trustee (again through ORIX, as its Special Servicer) considered, *inter alia*, the (a) the fees and costs associated with defending the Fraudulent Transfer Case; and (b) the prospects of recovering under the HPCH Promissory Note and the Doctors Hospital Guaranty. The Trust's decision to accept the Settlement Agreement was conditioned upon its ability to retain and enforce the HPCH Loan (including the Doctors Hospital Guaranty) to the fullest extent and without any application of the Settlement Proceeds to the obligations arising thereunder. Accordingly, the Settlement Agreement was not intended to discharge the HPCH Loan or any obligations arising thereunder (including the Doctors Hospital Guaranty)."

The foregoing portions of the affidavit were not supported by any documents, business records, or negotiation minutes, or agreements, and were thus the self-serving conclusions of the affiant.

At the time Nomura paid the settlement payment, the Trust was owed $94,681,728.84 for the HPCH Loan. This amount included the outstanding principal balance plus reimbursement owing to the Trust for various expenses and accruals which added to the amount owing under the HPCH Loan. [Defendant's Appx. 2, (Affidavit of R. Farrington, ¶ 15)]. Farrington was Manager of ORIX, and he detailed the claim that $94,681,728.84 was due as follows:

"12.    Under the PSA, and consistent with trust-level accounting principles, the Trust was not and is not required to apply the Settlement Proceeds (or the Net Settlement Proceeds (defined below)) to principal or interest due and owing under the HPCH Loan. The Trust did not and has not applied the Settlement Proceeds or the net Settlement Proceeds to principal or interest due and owing under the HPCH Loan.

13.    At the time the Settlement Proceeds were paid by Nomura, the Scheduled Principal Balance (as that term is defined in the PSA) owing ton the HPCH Loan was $44,638,338.01 (the "Scheduled Principal Balance").

14.    Also at the time the Settlement Proceeds were paid by Nomura, a series of advances and accruals had increased the amount due and

15

owing under the HPCH Loan by the additional amount of $50,043,390.83 (the "Total Advances and Accruals").

15.   When added together, the Scheduled Principal Balance and the Total Advances and Accruals created a total Trust exposure of $94,681,728.84 (the "Total Trust Exposure").

16.   From the Settlement Proceeds, the amount of $2,717,755.12 was allocated to estimated future advances of the Trust, leaving net Settlement Proceeds of $64,782,244.88 (the "Net Settlement Proceeds").

17.   Under the PSA, and consistent with the trust-level accounting principles, the Trust provisionally allocated (the "Provisional Allocation") the Net Settlement Proceeds o the Total Trust Exposure. Specifically, when the Net Settlement Proceeds ($64,782,244.88) are subtracted from the Total Trust Exposure ($94,681,728.84), there is an allocable loss to the Trust in the amount of $29,899,483.96 (the "Trust's Allocable Loss").[3] The Trust's Allocable Loss would be equal to the remaining amount of the Trust would have been owed by HPCH and Doctors Hospital, as guarantor, even if the Trust had applied the Settlement Proceeds to the amounts due and owing under the HPCH Loan. The Trust's Allocable Loss does not reflect any credits in connection with any successful credit bid made by the Trust in the foreclosure sale of the property subject to the mortgage granted by HCPH to secure the HCPH Loan.

18.   The Repurchase Price, as defined in the PSA, at the commencement of the New York Litigation, was approximately $93 million, which is substantially consistent with the Total Trust Exposure.

19.   The Provisional Allocation is not required under the PSA and the Trust is entitled to alter or amend the Provisional Allocation."

The foregoing affidavit in paragraphs 12 and 19 stated a mixture of argument, opinion

and conclusions not admissible to oppose Summary Judgment. Remaining paragraphs tended to

---

[3] The Trust's Allocable Loss includes a provisional allocation of $14,738,854.05 toward principal of the HPCH Loan.

support the contention of LaSalle that even if the Settlement payment is offset against the

LaSalle Claim, a substantial amount could still be due on the Claim.

LaSalle argues that its claims for breach of warranty might have included claims for

damages other than payments due on the mortgage debt, though it has not documented such

asserted damages nor did it sue for damages other than the "Repurchase Price" in the settled

lawsuit.  The affidavits it filed to oppose the Summary Judgment Motion do not even purport to

identify or document any such other claims.

Under the PSA, the Trust was not expressly required to apply the proceeds of the

Settlement Agreement to principal or interest due and owing under the HPCH Loan.  If,

however, the Trust were to apply the settlement payment from Nomura under the Settlement

Agreement to the Doctors Hospital Guaranty, LaSalle asserts that the Trust might still be owed

as much as $30 million under the Doctors Hospital Guaranty. [Defendant's Appx. 2, (Affidavit

of R. Farrington, ¶ 12, 17)].

26.     The Settlement Agreement did not provide for Nomura to repurchase the HPCH

Loan, or any obligations arising thereunder, and did not provide for payment under the

Settlement Agreement to be a credit toward the outstanding obligations owing under the HPCH

Loan, HPCH Promissory Note, or the Debtors Hospital Guaranty. [Defendant's Appx. 3,

(Affidavit of G. May, ¶ 6)].

27.     At the time the Settlement was paid by Nomura, the Scheduled Principal Balance

(as that term is defined in the PSA) owing on the HPCH Loan was $44,638,338.01 (the

"Scheduled Principal Balance"). [Defendant's Appx. 2, (Affidavit of R. Farrington, ¶ 13)]

(subject to Paloian's claim of offset and details in the Proof of Claim filed against the

bankruptcy estate of Doctors Hospital).

28.      However, as of the date the Settlement Proceeds were paid by Nomura, a series of advances and accruals are claimed to have increased the amount due and owing under the HPCH Loan by the additional amount of $50,043,390.83 (the "Total Advances and Accruals"). [Defendant's Appx. 2, (Affidavit of R. Farrington, ¶ 14)].

29.      On its books, the Trust allocated (it claims "provisionally") the Net Settlement Proceeds ($64,782,244.88) to the Total Trust Exposure. The Trust is now claiming a right to alter or amend the Provisional Allocation.

Additional factual matters set forth in the discussion that follows will comprise additional Undisputed Facts.

## CONCLUSIONS OF LAW

### *Standards for Summary Judgment*

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (made applicable in bankruptcy by Fed. R. Bankr. P. 7056). "The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Roge v. Yellow Freight Sys., Inc.*, 21 F. 3d 146, 148 (7th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). If the initial burden is met, the non-moving party that bears the burden of proof on a dispositive issue at trial must affirmatively demonstrate a genuine issue for trial on that issue. *See id.* Under Fed. R. Civ. P. Rule 56(a) and Rule 7056(a) Fed. R. Bankr. P., a party may move for summary judgment on separate issues thereby seeking to resolve those issues before trial. Partial summary judgment as to particular issues is permitted if the movant shows there is no genuine issue of material fact on that part or all of a claim or defense. Fed. R. Civ. P. 56(a).

18

*Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003), discussed the difference between useable

and non-useable "self-serving testimony" offered by affidavits on summary judgment motions.

*Payne* was a § 1983 lawsuit. *Id.* at 769.  The district court had granted summary judgment,

holding that even crediting the plaintiff's version of events, the defendant-officer was entitled to

qualified immunity. *Id.* at 770.  The Seventh Circuit reversed. *Id.* at 773. It held that the district

court improperly made a credibility determination about the plaintiff's version of the facts.  *Id.*

In doing so, the opinion discussed the difference between the types of self-serving testimony that

should be considered in a summary judgment procedure and the types of testimony that should

not. *Id.* at 770-72. The opinion made clear that the answer lies at the point where direct personal

knowledge which may be used crosses the line into impermissible inference and speculation

which may not be used. *Id.* at 773.

In attempting to define these boundaries for lower courts, the *Payne* opinion first noted

that the Federal Rules of Civil Procedure expressly contemplate that "parties may submit

deposition testimony as evidence for purposes of determining whether a genuine issue of

materials fact exists." *Id.* at 770 (citing Fed. R. Civ. P. 56(c)).  This includes a party's own

deposition testimony.  Indeed, the court identified numerous examples where it had "found [] a

nonmoving party's own affidavit can constitute affirmative evidence to defeat a summary

judgment motion." *Id.* (citing cases).  Thus, the fact that the plaintiff in *Payne* submitted her

own deposition testimony describing her own version of the facts did not in itself render the

evidence inadmissible for summary judgment purposes.

However, the opinion also discussed cases holding that "self-serving, uncorroborated,

and conclusory statements in testimony are insufficient to defeat a motion for summary

judgment." *Id.* at 772.  The critical difference is that such testimony was "not based on personal

19

knowledge as required by both the Federal Rule of Civil Procedure on summary judgment . . .

and by Federal Rule of Evidence 602." *Id.* at 772 (citations omitted).  Instead, the testimony was

held to be based on "flights of fancy, speculations, hunches, intuitions, or rumors about matters

remote from" the witness's own first-hand experience. *Id.* (citing *Visser v. Packer Eng'g Assoc.*

*Inc.*, 924 F.2d 655, 659 (7th Cir. 1991)).  Examples of the latter include testimony about the

defendant's state of mind, or testimony so devoid of detail that it renders the testimony

conclusory. *Id.* at 772-73 (citing cases).  Therefore, conclusory opinions may not be used to

establish matters for purpose of summary judgment.  And that is the very problem with parts of

the affidavits submitted by LaSalle in opposition to Summary Judgment.

## I.
## ILLINOIS LAW PROHIBITS THE DOUBLE
## RECOVERY SOUGHT BY THE LASALLE PROOF OF CLAIM

Illinois law applies to the double recovery issue.  Illinois adheres to the single recovery

principle, which "holds that there may not be more than one recovery of damages for a single,

indivisible injury." *Saichek v. Lupa et al.*, 204 Ill. 2d 127, 140 (2003).  *Accord, Robinson v.*

*Toyota Motor Credit Corp. et al.*, 201 Ill. 2d 403, 422 (2002) (". . . for one injury there should

only be one recovery irrespective of the availability of multiple remedies and actions"); *Wilson*

*v. The Hoffman Group*, 131 Ill. 2d 308, 321 (1989) ("only one recovery for an injury"); *Dial v.*

*City of O'Fallon*, 81 Ill. 2d 548, 558 (1980) ("a plaintiff shall have only one satisfaction for an

injury . . . irrespective of the availability of multiple theories that recovery for the injury can be

sought under ").

New York law, the governing law in the Nomura Loan documents, follows the same rule.

*Int'l Fidelity Ins. Co. v. City of New York*, 263 F. Supp. 2d 619 (E.D.N.Y. 2003) ("[u]nder the

New York doctrine of double recovery, defendants are precluded from bringing claims seeking a

second recovery for the same injury"); *Zarcone v. Perry et al.*, 434 N.Y.S.2d 437, 433-44 (N.Y.

App. Div. 1980) (finding double recovery rule barred plaintiff who had already recovered

damages in federal court on same alleged facts constituting state action); *Carter v. State*, 546

N.Y.S.2d 648 (N.Y. App. Div. 1989) (applying rule where unjustly convicted claimant brought

claim under Unjust Conviction and Imprisonment Act after being fully compensated in prior

civil rights action for same injury); *Leighty v. Brunn et al.*, 510 N.Y.S.2d 174, 175 (N.Y. App.

Div. 1986) ("[i]t is beyond cavil that a plaintiff is entitled to only one recovery with respect to an

identical damage claim"): *Lucio v. Curran et al.*, 2 N.Y. 2d 157, 162 (1956) (invoking same

principle).  One New York court has recognized that a suit to enforce a loan guaranty may result

in an impermissible double recovery where the original debtor defaulted (thus triggering liability

on the guaranty), but a new debtor assumed the loan obligations and began to make loan

payments.  *City of New York v. Clarose Cinema Corp.*, 681 N.Y.S. 2d 251 (N.Y. App. Div.

1998).

　　　　LaSalle sustained only one injury as a result of its ownership of the Nomura Loan: the

loss of the loan's outstanding principal balance and related interest, fees and applicable

expenses.  The settled lawsuit sought to recover only the loan debt that was due, no matter what

theories were advanced.  LaSalle sued to recover the "Repurchase Price" under several theories,

but "Repurchase Price" comprised elements of the Proof of Claim for the mortgage debt now

pending against the estate.  That same loan balance sought by the Proof of Claim from the estate

is what LaSalle sought to recover from Nomura in the New York Litigation.  LaSalle's Amended

Complaint against Nomura in the New York Litigation was based on provisions in their loan

purchase agreement requiring Nomura to repurchase the loan by payment of the "repurchase

price."  The "repurchase price" was defined as "the unpaid principal balance" of the loan plus

21

unpaid interest, fees, and expenses. (App. 5 at 7 n. 6). Those claims are still included in

LaSalle's pending claim against the estate for payoff of the mortgage debt asserted to be still due

to it. And, most important, LaSalle has failed to show that it actually had other documented

damages or that it negotiated to recover for other supposed damages in the Settlement.

## LASALLE'S ARGUMENT

### *Introduction*

The Debtor has not paid the Trust on the Doctors Hospital Guaranty since it filed this

bankruptcy case on April 17, 2000, and the Trust has not expressly forgiven the Debtor's

obligations under the Doctors Hospital Guaranty. The Debtor's obligations under the Doctors

Hospital Guaranty, as documented by Defendant's secured Proof of Claim, are therefore argued

to remain unchanged by the settlement.

Nevertheless, the Chapter 11 Trustee, Gus A. Paloian, as Counter-Claim Plaintiff

("Plaintiff"), seeks a determination that the estate's obligations under the Doctors Hospital

Guaranty should be deemed reduced or eliminated by the Settlement payment. LaSalle argues

that the obligation is not reduced or eliminated because the Trust received a settlement payment

from a third-party, Nomura, to resolve breach of contract litigation to which the Debtor was not

a party. Defendant argues that the settlement payment did not represent a payment of principal

and interest under the HPCH Loan and the Doctors Hospital Guaranty (even though that is

precisely what it sued for) but rather was the settlement of wholly separate claims against

Nomura arising under a wholly separate contract to which the Debtor was not a party (although

such claims were never pleaded in the settled case and were not documented in the responses to

the Summary Judgment Motion).

LaSalle views the critical facts as follows:

- Nomura made a loan to HPCH, LLC, an affiliate of the Debtor, evidenced by the HPCH Promissory Note, and guaranteed by the Debtor pursuant to the Doctors Hospital Guaranty (which guaranty was secured by, *inter alia,* a pledge of the assets of Doctors Hospital);

- Nomura sold the HPCH Promissory Note, the Doctors Hospital Guaranty, and related loan documents, along with over one hundred other Mortgage Loans, to the Trust pursuant to a *Mortgage Loan Purchase and Sale Agreement* and a *Pooling and Servicing Agreement* (the "Securitization Documents"). The Securitization Documents contained over forty-three different Representations and Warranties made by Nomura regarding the Mortgage Loans, including the HPCH Loan;

- Nomura's Representations and Warranties regarding the HPCH Loan were allegedly false, and LaSalle as Trustee initiated litigation in New York on behalf of the Trust against Nomura for breach of the Securitization Documents;

- LaSalle as Trustee and Nomura settled the New York litigation. It argues that there was no release that satisfied or cancelled the debt due from an intended third party beneficiary, or any other act or deed purported to extinguish the HPCH Loan or the Doctors Hospital Guaranty. Nor was there any express agreement that the settlement payment be *on account of,* or *on behalf of,* HPCH or the Debtor in this case.

LaSalle argues that enforcement of the Doctors Hospital Guaranty does not seek a double recovery or windfall, and that Plaintiff's argument misconstrues applicable law, the Securitization Documents, and the Settlement Agreement. It argues that Plaintiff seeks a "windfall" by asking this Court to eliminate the estate's obligations which it has not paid.

The arguments advanced by Trustee are asserted by LaSalle to fail for several reasons:

First, Nomura's breach of Representations and Warranties in the Securitization Documents could only affect the HPCH Loan by substituting creditors. Had Nomura complied with remedial provisions of the Securitization Documents, it would have repurchased the HPCH Loan and the Doctors Hospital Guaranty from Defendant and become the holder of the

obligations thereunder.  As such, Nomura would have been the successor to Defendant and been

entitled to enforce the Doctors Hospital Guaranty.  Thus, under either repurchase or settlement,

the underlying obligations of Doctors Hospital would not be extinguished; they would merely be

owing to a different obligee. The only windfall here, then, would be a determination in favor of

Plaintiff that Doctors Hospital no longer owes Defendant under the Doctors Hospital Guaranty.

Second, the damages sustained by LaSalle for Nomura's breach of Representations and

Warranties in the Securitization Documents are separate and distinct from obligations of the

Debtor under the Doctors Hospital Guaranty even though the relief sought in the settled

Complaint was only for payment of those obligations and no other damages were pleaded or

documented here.  LaSalle argues further that Nomura  was not a co-maker or co-obligor under

the  Doctors Hospital Guaranty, and Doctors Hospital was neither a party to the Securitization

Documents nor an entity which made the Representations and Warranties. LaSalle paid a price

for the bundle of Mortgage Loans held in the Trust under the Securitization Documents.

Nomura's breach of its Representations and Warranties supposedly caused Defendant to overpay

for the entire bundle of the Mortgage Loans.  LaSalle argues that a settlement of claims for such

overpayment would not affect the validity of, or obligations under the Doctors Hospital

Guaranty, even though no such "overpayment" was sought to be recovered in the settled action

and none was established by materials filed in opposition to Summary Judgment.

LaSalle also contends that the substance of Plaintiff's argument has been rejected by

other courts, in cases adjudicating credit default swaps, and cases interpreting the collateral

source rule.

It also argued under the PSA, trust accounting principles and asserted precedent, that the

Trust is not required to apply the Nomura payment to the Doctors Hospital Guaranty.  The

affidavit of Robert Farrington said that the Nomura settlement payment was in fact not applied to the Doctors Hospital Guaranty.

Finally, LaSalle argues that even if Trustee's argument and motion are accepted here, the Farrington Affidavit is said to show that a substantial balance would remain due on the Doctors Hospital Guaranty even if and after the Nomura payment were credited to the estate's obligations on the Doctors Hospital Guaranty.[4]

## A.   The LaSalle Argument that it is not Seeking a Double Recovery

Trustee Paloian asserts that Counter-Defendant would obtain a windfall and a double recovery if the Doctors Hospital Guaranty is not credited with proceeds of the Settlement Agreement.  He relies upon the New York Litigation in which LaSalle sought to return the HPCH Loan to Nomura in exchange for the previously agreed upon Repurchase Price (as defined in the PSA).  But Counter-Defendant LaSalle reasons that had Nomura complied with its repurchase obligation, Nomura would today be the holder of the HPCH Loan and entitled to enforce the Doctors Hospital Guaranty.  Paragraph 3(b) of the MLPSA expressly provided that upon payment of the Repurchase Price for any Mortgage Loan, Nomura would be vested with the legal and beneficial ownership of such Mortgage Loan and all rights and remedies thereunder. [Defendant's Appx. 1 (MLPSA3(b))].  Thus, had LaSalle as Trustee obtained a judgment against Nomura in the New York Litigation, it is argued that the estate's obligations

---

[4] LaSalle further points out that this Court entered judgment that the amount, if any, due on the Doctors Hospital Guaranty is secured by liens on and security interests in $3,380,000 of proceeds received by the estate from Dr. James Desnick. However, that ruling did not expressly or impliedly deal with any Counterclaim issues in this proceeding or adjudged that specific amounts are actually due.

would not be satisfied; those obligations would be owing to Nomura, and without credit for the

Repurchase Price.

But that argument ignores the fact that the LaSalle claims in bankruptcy were neither

assigned to Nomura nor were they taken over or asserted by Nomura or his own behalf.   LaSalle

is just asserting Nomura's supposed argument or claim on its own behalf.

The Settlement Agreement did not return the HPCH Loan to Nomura.  Instead, Nomura

paid Defendant damages.  While LaSalle originally argued that the agreement "expressly"

provided for Defendant to retain its rights under the HPCH Loan and the Doctors Hospital

Guaranty, there was in fact no express provision in the Settlement Agreement whereby LaSalle

retained its rights in the Nomura Loan Guaranty.  Called to task on its mistaken claim of an

"express provision" in the Settlement Agreement that supposedly retained LaSalle's rights in the

Nomura Loan and Guaranty, LaSalle later revised its argument.  In the LaSalle Sur-Reply, it

merely argued that the Settlement Agreement did not "make any sense whatsoever if Defendant

did not retain the HPCH Loan and the Hospital Guaranty pursuant to its settlement with

Nomura," a mere argument and conclusion that was not supported by documents or materials

filed.

While the Settlement Agreement did not specifically extinguish the validity of the

HPCH Loan or the Doctors Hospital Guaranty, Exhibit B thereto provided that "[t] he

[Defendant] shall otherwise retain all of its rights in and to all Mortgage Loans owned by

[Defendant] including the Doctors Hospital loan that was the subject of the [New York

Litigation]."  See Settlement Agreement at 4, 6, Exhibit B thereto.  That was a classic example

of A and B coming to a decision about the rights of another, an agreement that certainly does not

bind the other.  As discussed more fully in Part II of this Opinion, Exhibit B was not specifically

incorporated into or made part of the Release document. It was merely a form of notice to interested parties that was agreed to by the settlement parties.

Beyond that, the conclusory May affidavit tried to argue that the LaSalle settlement with Nomura was predicated upon it (1) continuing to defend Adversary 02 A 363[5] related to the Doctors Hospital bankruptcy case; and (2) retaining the right to enforce the HPCH Loan and the Doctors Hospital Guaranty, as opposed to returning those rights to Nomura. [Defendant's Appx. 3, (Affidavit of G. May, ¶ 8)]. But based on previously cited Circuit precedent, those unsupported conclusions carry no weight in opposing the pending Motion.

LaSalle's Sur-Reply continued to evolve its argument once it conceded that there was no express provision in the settlement that retained LaSalle's rights in the Nomura Loan and Guaranty:

> Plaintiff incorrectly conflates Defendant's claim on the Hospital Guaranty and Defendant's claims against Nomura by arguing that both sought to recover the principal and interest due on the HPCH Loan (*see e.g.*, Reply, p. 9, ¶1) and that "there can only be a single injury for the borrower's failure to pay" (Reply, p. 7, ¶1). However, as noted in the [original] Response [by LaSalle], Defendant's claims against Nomura did not seek to recover the principal and interest due on the HPCH Loan (Response, pp. 13-15), but rather the "Repurchase Price" under the MLPSA - which included many more elements of damages than simply principal and interest. Defendant's claim on the Hospital Guaranty and Defendant's claims against Nomura are "separate and distinct" and arose under wholly separate contracts.

However, despite that conclusory argument, the "Repurchase Price" sued for in the New York litigation did indeed include all debts involved in the loan debt, including principle, interest, plus expenses and fees incurred to effect recovery and expenses relating to a repurchase (if any). It

---

[5] In Adversary (02 A 00363), the Chapter 11 Trustee sought to recover assertedly fraudulent transfers made to LaSalle. Following a first trial in 2007, the Adversary was remanded by the Seventh Circuit for further proceedings. A trial on remand concluded and the matter is under advisement. The right of LaSalle to continue its defense of that action is in no way contradictory of issues posed in this Summary Judgment proceeding.

was not defined to include any other "damages" and none have been identified in response to the

instant Motion nor claimed by pleading in the settled case in addition to the "Repurchase Price."

**B.    Setoff is said to be Unwarranted Because Nomura's
    Breach of Representations and Warranties Are Asserted
    to Have Caused Separate and Distinct Damages from the
    Obligations Owing Under the Doctors Hospital Guaranty**

Plaintiff's Summary Judgment Motion requests setoff of Nomura's payment under the

Settlement Agreement against the amount owing by the estate under the Doctors Hospital

Guaranty. Setoff has been defined as follows:

> The term 'setoff' is used in two distinct ways. In one sense, a setoff 'refers to the
> situations when a defendant has a distinct cause of action against the same
> plaintiff who filed suit against him' and is subsumed procedurally under the
> concept of counterclaim.' Applying this meaning, a setoff may refer to a
> situation when the defendant claims that the *plaintiff has* done something that
> results in a reduction in the defendant's damages. When a defendant pursues this
> type of setoff, the claim must be raised in the pleadings.
>
> In another sense, however, the term 'setoff' may refer to a defendant's request for
> a reduction of the damage award because a *third party* has already compensated
> the plaintiff for the same injury. This occurs, for example, when a co-defendant
> who would be liable for contribution settles with the plaintiff. This type of setoff
> may be raised at any time.

*Thornton v. Garcini*, 237 Ill. 2d 100, 113 (2010)(emphasis in original) (internal citations

omitted).

"The party seeking setoff has the burden of proving what portion of a prior settlement

was allocated or attributable to the claim for which he or she is liable. A court considering setoff

will not speculate about such matters and will deny the request if the party has failed in that

burden." *Thornton v. Garcini*, 382 Ill. App. 3d 813, 820 (Ill. App. Ct. 2008)(citations omitted),

*aff'd Thornton v. Garcini*, 237 Ill. 2d 100 (2010); *see also Kravcik v. Golub & Co., Inc.* 286

Ill. App. 3d 406 (Ill. App. Ct. 1996) (where defendants failed to establish that plaintiffs were

28

compensated twice, and further failed to even request good faith hearing to determine allocation of damages between, the court held that defendants neither pleaded nor proved their entitlement to setoff and thus affirmed trial court's finding that defendants were not entitled to setoff as a matter of law).

If LaSalle had shown that the Settlement was partially effected to settle damage claims apart from claims for "Repurchase Price," a hearing would indeed be required to allocate the settlement to such separate claims. But no such showing was made.

**C.    LaSalle Argues that the New York Litigation and
Enforcement of the HPCH Loan were Independent
Causes of Action Giving Rise to Separate and Distinct Damages**

The damages sought by LaSalle as Trustee in the New York Litigation, and the obligations owing under enforcement of the Doctors Hospital Guaranty, are argued to arise from legally unrelated rights and contracts, and represent separate and distinct damages.

Disregarding what damages the settled complaint actually sought, it is argued that the Trust's recovery from Nomura was not for payment of principal or interest under the HPCH Loan or the Doctors Hospital Guaranty, but it was a claim for "misrepresentations related to the value of the investments Nomura sold into the Trust."

Illinois law and Seventh Circuit precedent do hold that setoff is not appropriate for separate and distinct injuries. *See Pasquale v. Speed Products Eng'g,* 166 Ill.2d 337, 370, 654 (1995)( "It is clear that a setoff is inappropriate where sought to be applied against a recovery for injuries 'separate and distinct' from those for which the plaintiff was already compensated through settlement."); *Zivitz v. Greenberg,* 279 F.3d 536 (7th Cir. 2002) (jury could have concluded that certain actions by a defendant exacerbated plaintiff's injuries caused by defendant's other actions in furtherance of conspiracy, and that plaintiff therefore suffered

29

related but not identical injuries); *Eljer Mfg, Inc. v Kowin Dev. Corp.*, 14 F.3d 1250 (7th Cir.

1994) (upholding an arbitrator's finding that plaintiff who was called upon to pay his guaranty

as a result of defendant's fraud was also entitled to be compensated for the benefit of its bargain

and lost profits arising from the same fraud, such that the damages were separate and distinct and

the two awards were not incompatible).

Here, Defendant paid Nomura a fixed amount of money for the Mortgage Loans in the

Trust. The purchase price for the Mortgage Loans was argued by LaSalle (without

documentary support) to have been correlated to the value (the expected rate of return) of the

Mortgage Loans. In turn, the value of the Mortgage Loans was supposedly correlated to the

perceived lack of veracity of the Representations and Warranties in the Securitization

Documents, including the Origination Warranty, the 80% Warranty, and the Qualified Mortgage

Warranty. Nomura's breach of its Representations and Warranties assertedly diminished the

value of the Trust, and it is argued that it was for this injury that the Trust was in fact

compensated in its settlement with Nomura. But the foregoing argument is only a bare bone

conclusion in the May affidavit, not supported by details by him or otherwise by any

calculations, or documents offered in support of this argument.

Defendant also argues that its claim against the estate is solely predicated upon the

Doctors Hospital Guaranty, not on its contract with Nomura. HPCH, LLC nor Doctors Hospital

were party with Nomura to the Securitization Documents. Neither HPCH nor Doctors Hospital

made the Representations or Warranties alleged in the Complaint on which the Settlement

Agreement was predicated. Nomura was not a co-maker on the HPCH Promissory Note or the

Doctors Hospital Guaranty.

30

LaSalle does concede however, that if two contract obligors make the same promise to their contract counterpart, setoff will lie if one of the obligors performed the promise. *Restatement (Second) Contracts,* §§289, 293 (2012).  It thereby concedes that a lender cannot recover on the same loan twice:  once from the borrower and a second time from the guarantor. This rule of law is argued to have no application where two obligors make promises to separate parties in separate contracts even if the promises are the same, but that argument is not supported by applicable authority.

Plaintiff's contrary argument is said by LaSalle to have been rejected  by other courts in similar factual contexts.  *See In re Cyrus II P'ship,* Bankr. No. 05-39857, Adv. No. 07-3301, 2008 WL 4371670  (Bankr. S.D. Tex. Sept. 11, 2008) and in an oral ruling in *In re Canoco, Inc.,* Case No. 06- 11262 (Bankr. W.D. La.) (Transcript (partial) dated February 5, 2007 pp. 32-5; Callaway, J.); Def. Appx. 4.

But neither of those cases rested on the rule of non-bankruptcy state law applicable here, and neither discussed that rule of law.

## D.    Cases Analyzing Credit  Default Swaps
##       Do Not Support LaSalle's Position

Cases involving credit default swaps are asserted by LaSalle to be analogous to the instant issue:  "A credit default swap is a financial instrument, similar to insurance, used by corporations  to transfer credit risk from one party to another.   To the extent a credit default swap  pays money owed  to a lender when a borrower defaults on a loan, the benefit does not accrue to the borrower." *Yares v. Bear Stearns Residential Mortgage Corp.,* No. CV 10-2575-PHX-JAT, 2011 WL 2531090, at *6 (D. Ariz. June 24, 2011).

31

Opinions were cited construing debtor-creditor relationships under state law involving credit default swaps and holding that debt is not discharged where a lender is compensated pursuant to a credit default swap. For exanple, in *Bean v. BAC Home Loans Servicing, L.P.,* No. 11-CV-553-PHX-GMS, 2012 WL 10349, at *5 (D. Ariz. Jan. 3, 2012), the plaintiff acknowledged that she had not paid her outstanding loan but argued "'based on the standard business practices of lenders engaged in securitized loan transactions, mortgage guarantees and insurance, it is plausible that Plaintiff's Note was paid through an industry arrangement'." The opinion rejected this argument, stating that ". . . even if one of the Defendants received proceeds of a credit default swap when Plaintiff defaulted on her loan, Plaintiff is not entitled to the cancellation of the loan or quiet title to the property." *Id.* at *5, *citing Yares, supra.*

In *Flores v. Deutsche Bank Natl. Trust, Co.,* No. DKC 10-0217, 2010 WL 2719849, *5 (D. Md. July 7, 2010), the opinion applied similar reasoning, defining what it meant by a credit default swap:

> "[A] CDS contract is a separate contract, distinct from Plaintiffs' debt obligations under the referenced credit (i.e. the Note). The CDS contract is a 'bilateral financial contract' in which the protection buyer makes periodic payments to the protection seller. *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.,* 375 F.3d 168, 172 (2d Cir.2004). If the credit event occurs, the CDS buyer recovers according to the terms of the CDS contract, not the referenced credit. Any CDS 'payout' is bargained for and paid for by the CDS buyer under a separate contract. *See In re WorldCom, Inc. Sec. Litig.,* 346 F. Supp.2d 628, 651 n. 29 (S.D.N.Y.2004) (explaining that a premium is paid on a swap contract to the seller for credit default protection, and if the default event does not occur, payer has only lost the premium). CDS do not, as Plaintiffs suggest, indemnify the buyer of protection against loss, but merely allow parties to balance risk through separate third party contracts. Therefore, Plaintiffs' 'double recovery' argument fails as a matter of law."

*Larota-Florez v. Goldman Sachs Mortg. Co.,* 719 F. Supp. 2d 636, 641-42 (E.D. Va. 2010) *aff'd.* 441 F. App'x 202 (4th Cir. 2011).

A recent Fourth Circuit opinion was also cited in the LaSalle argument:

> As a last resort, Horvath argues that the appellees should not have been able to foreclose on his property because they did not suffer any losses from his default. In his view, the profits from the securitization of his mortgage must have offset any losses the appellees incurred from his default. We reject this claim as well. While Virginia law does recognize a limited 'double recovery' defense to foreclosure proceedings, *see Nizan v. Wells Fargo Bank Minn. Nat'l Ass'n,* 274 Va. 481, 650 S.E.2d 497 (2007), that defense does not allow individuals in default on a mortgage to offset their outstanding obligations by pointing to the mortgagee's unrelated investment income.

*Horvath v. Bank of New York, N.A.,* 641 F.3d 617, 626 (4th Cir. 2011).

LaSalle argues from those cases that if a lender receives funds from an obligation independent of the borrower contract, such funds are not credited to the obligation of the borrower. LaSalle argues that those cases apply to the Trust's settlement recovery from Nomura which was pursuant to a wholly separate contract, not pursuant to the Doctors Hospital Guaranty.

However, that cited authority does not apply here. First, nothing like a credit default swap is involved here, and those cases did not involve the payment issues presented here. The Settlement payment here has been shown to have paid the very debts claimed by the Proof of Claim filed against the bankruptcy estate. Second, LaSalle says its cases stand for the very general proposition that a guarantor "is not entitled to a credit for payments made by a third party." If that were true, guarantors would not get the benefit of payments made by the borrower whose loans they guarantee, something even LaSalle recognizes as a double recovery. (Response at 14 n.9). It is the nature of the third party that matters, and the seller of a credit default swap is quite distinct in nature from Nomura who was the seller of the loan. Unlike a credit default swap seller, Nomura never agreed to insure against any defaults on the loan. Nomura's warranties related strictly to the quality of the loan.

33

**E.**     **The Collateral Source Rule has no Application Here**

The "collateral source" rule is an exception to the doctrine of double recovery, usually applied to tort cases. *Wills v. Foster,* 229 Ill.2d 393, 399 (2008). Under the collateral source rule, benefits received by the injured party from a source independent of, and collateral to, the party causing the injury will not otherwise diminish the damages recoverable from that party. *Muranyi v. Turn Verein Frisch-Auf,* 308 Ill. App.3d 213, 215 (Ill. App. Ct. 1999) Thus, "the plaintiff may recover twice for a single injury--once from the defendant and once from the collateral source." *Id.*

However, Illinois law actually holds that "the collateral source rule applies in contract cases only where there is an element of fraud, tort, or willfulness." *American Fidelity Fire Ins. Co. v. General Railway Signal Co.*, 184 Ill. App. 3d 601, 617 (1st Dist. 1989). No such element has been factually established in defending against the Summary Judgment Motion, and so the rule is inapplicable. The collateral source rule does not ordinarily apply in contract cases because contract damages are intended to put the injured party in as good a position as it would have been if the contract was performed. "[N]o one should profit more from the breach of an obligation than from its full performance." *Garofalo v. Empire Blue Cross & Blue Shield*, 67 F. Supp. 2d 343, 347 (S.D.N.Y. 1999).

**II.**
**THE EFFECT OF GIVING A GENERAL RELEASE TO NOMURA**

### *Introduction*

As stated earlier, it is also argued that the General Release signed by LaSalle in the Settlement also released its Proof of Claim. The unconditional release of one of several joint tortfeasors may release all, even where the latter were not a party to the release or specifically

34

identified in the release. *Porter v. Ford Motor Co.*, 449 N.E.2d 827 (Ill. 1983), a release rule

applicable as well to co-obligors on a contract. *Cherney v. Soldinger*, 702 N.E.2d 231, 234 (Ill.

Ct. App. 1998).

Illinois modified the common law rule through enactment of the Joint Tortfeasor

Contribution Act. 740 ILCS 100/2. A joint tortfeasor is not discharged from liability unless the

release so provides. *Id.* That Act abolishes the common law rule with respect to certain

tortfeasors only (intentional torts are not covered). *Cherney*, 702 N.E.2d at 235.

Second, Illinois courts have modified the common law rule to reflect a more "'reasonable rule'

that where the release of one of several obligors shows upon its face, and in connection with the

surrounding circumstances, that it was the intention of the parties not to release the co-obligors,

such intention, as in the case of other written contracts, shall be carried out, and to that end the

instrument shall be construed as a covenant not to sue." *El Funding P'ship v. Voegel*, 2012 Ill.

App. Unpub. LEXIS 2450, at *6 (Ill. App. Ct. Sep. 28, 2012) (quoting *Parmelee v. Lawrence*, 44

Ill. 405 (1867). In those situations, court will examine the language of the release and

circumstances leading to its execution. *El Funding P'ship*, 2012 Ill. App. Unpub. LEXIS 2450,

at *6. The rationale for this test is that "it is not the purpose of the rule to release a co-obligor

when a claim has been only partially settled between the claimant and another obligor if the

claimant's intent is not to release the other obligor but hold him responsible for the balance of

the claim. *Id.* (citing *Diamond Headache Clinic, Ltd. v. Loeber Motors, Inc*, 526 N.E.2d 599 (Ill.

App. Ct. 1988).

Under the New York General Obligations Law, when a release is given to one of two or

more tortfeasors responsible for the same injury, it does not discharge any of the other

tortfeasors unless the terms of release expressly so provide. N.Y. Gen. Oblig. Law § 15-108(a)

35

(Consol. 2012). This exception abrogates the common law rule that a release given to one

tortfeasor effectively releases the potential liability of any other tortfeasor for the same liability.

*Ellithorpe v. State of New York*, 839 N.Y.S.2d 433 (N.Y. Ct. Cl. 2007). Other sections of that

statute dealing with the right to contribution among co-obligors but not regarding a general

release have been construed to apply to co-obligors in contract even though the statute does not

refer to co-obligators on a contract. *Mathis v. United Homes, LLC*, 607 F. Supp. 2d 411, 431

(E.D.N.Y. 2009); *M7T Mortg. Corp. v. White*, No. 04-CV-4775(NGG)(VVP), 2009 U.S. LEXIS

31296, at *9–10 (E.D.N.Y. Apr. 14, 2009) (citing cases)

**A.**   <u>**Rights And Claims Released And Not Released**</u>

Each party was asked to identify the rights and claims that were released and not released

in the Settlement Agreement and Mutual Release dated as of July 18, 2006, and then discuss the

foregoing authority.

The main provisions of the mutual release contain parallel language whereby LaSalle and

NACC/ASC release each other from "any claim, obligation right, cause of action, liability,

contract, agreement, promise, damage, cost, attorney's fee, and expense" ... "based in whole or

in part on the (1) claims that the parties made against each other "in the Doctors Hospital Action

*[i.e., the settled lawsuit]* and/or arising out of, in connection with or on account of the Doctors

Hospital Loan and/or the Doctors Hospital Action;" and (2) claims or counterclaims that the

parties "could have been made" against each other "in the Doctors Hospital Action which arise

out of, in connection with or on account of the Doctors Hospital Loan and/or the conduct of any

party in and/or in connection with the Doctors Hospital Action." The release excepts (1) claims

relating to loans other than the Doctors Hospital loan; (2) claims asserted in another specified

suit between the parties; and (3) claims for breach of the settlement agreement itself. ( 4(a))

The release also covers claims that the parties may have against each other by reason of third-party claims "arising out of, in connection with, or relating to the Doctors Hospital Loan."

LaSalle released its guaranty proof of claim damages sought against Doctors Hospital, the same recovery it seeks in the bankruptcy case. LaSalle did not do so directly, because the release is limited to LaSalle's claims against Nomura and ASC. As earlier demonstrated hereinabove, LaSalle's claim against Nomura and ASC was for the same damages that LaSalle also continues to seek through its proof of claim in bankruptcy:[6] the principal and interest due on the Nomura Loan. The release of "damages," certainly extends to any type of claim against Nomura or ASC for the amount due on the loan. The only remaining question is whether LaSalle's release of Nomura effectuated a release of LaSalle's guaranty proof of claim against Doctors Hospital.

**B.**   **Doctors Hospital Released As Co-Obligor**

**1.**   **Illinois Law**

Under the Illinois common law rule, LaSalle's release of its claims against Nomura/ASC resulted in the release of LaSalle's claim here against Doctors Hospital because Doctors Hospital is a co-obligor with Nomura/ASC. The key to this conclusion is the Illinois courts' repeated statements that the release of joint obligors applies to parties who are liable for a single indivisible injury as well as to parties who are technically liable as joint obligors. These cases

---

[6] As a "threshold matter," LaSalle protests that Paloian has not raised the defense of release and it is therefore not before this Court. (LaSalle Supp. Br. Tt 2) LaSalle's objection is meritless. The Seventh Circuit recognizes that a court "has an obligation to raise legal issues that the parties have overlooked or neglected." *Southern Illinois Riverboat Casino Cruises, Inc. v. Triangle Insulation & Sheet Metal Co.*, 302 F.3d 667 (7th Cir. 2002), quoting *Jones v. Page*, 76 F.3d 831, 850 (7th Cir. 1996). This Court therefore properly raised the release issue *sua sponte*.

In any event, th release issue involves essentially the same inquiry as the broader issue on this motion, i.e., whether LaSalle has been fully compensated for its single injury.

harmonize well with the Illinois cases, cited in support of the pending motion for summary

judgment, that state an overall policy against double recovery.

In *McCormick v. McCormick,* 180 Ill. App.3d 184 (1st Dist. 1988), the opinion

addressed the Illinois common law rule providing that the release of one joint tortfeasor is the

release of all. "This theory," said the court, "applied to those currently liable for a single

indivisible injury as well as to those that were technically joint tortfeasors." *Id.* at 204.

Although the case involved a breach of fiduciary claim predating the Illinois Tortfeasor

Contribution Act that eliminated the common law rule as it related to torts, the court's focus on

"a single indivisible injury" remained important for courts dealing with non-tort claims.

In *Cherney v. Soldinger,* 299 Ill. App.3d 1066, 1067 (1st Dist. 1998), the opinion applied

the common law rule to plaintiffs' release of a breach of fiduciary duty claim against Burton

Cherney, holding, first, that the claim was not subject to the Contribution Act and, second, that

the release of the claim precluded plaintiffs' second claim for breach of fiduciary duty against

their accountant. The opinion reached this conclusion despite the fact that the accountant and

Burton Cherney, plaintiffs' fellow officer and director, had differing fiduciary duties to the

plaintiffs. *Id.* at 1073. The key to the court's decision was that both Burton and the accountant

were liable for the same injury. *Id.* As the opinion said, "plaintiffs seek to recover in this case

the very same monies they sought to recover against Burton in the earlier litigation." *Id.* at 1074.

The opinion concluded that "the loss in this case is identical and inseparable from the loss in the

earlier suit, which was settled." *Id.* Applying the common law rule, the court determined that

"the unqualified release of plaintiffs' claims against Burton also released defendant." *Id.* In this

case, as Paloian has demonstrated, LaSalle has suffered only one injury, the amount owing on

the Nomura Loan. Under the common law rule, then, by releasing Nomura and ASC from

38

claims for that amount, LaSalle has also released its claim against Doctors Hospital for the exact same injury.

In *El Funding P'ship v. Voegel,* No. 1-11-3712, 2012 WL 6964867 (1st Dist. Sept. 28, 2012), the opinion expanded on the standard articulated in *Cherney v. Soldinger*. It first noted that "the purpose behind the rule is to prevent a claimant from receiving multiple recoveries for a single claim." *Id.* at *3. "However," it continued, "it is not the purpose of the rule to release a co-obligor when a claim has been only partially settled between the claimant and another obligor if the claimant's intent is not to release the other obligor but to hold him responsible for the balance of the claim." *Id.*

But none of the circumstances identified in *El Funding* exist in this case. There are no circumstances that would make release of Doctors Hospital inconsistent with the purpose behind the rule. First, in *El Funding* the reservation in the release was express, specifically identified the co-obligor, and stated the amount of his obligation. Here, in contrast, the release shows no intent not to release Doctors Hospital. Paloian has demonstrated this to be true- despite LaSalle's claim that the settlement agreement somehow reserved its right to enforce the Doctors Hospital Guaranty. In fact, in its surreply, LaSalle essentially could only say, without citing any specific language, that the release "makes no sense whatsoever if Defendant did not retain the [Nomura Loan and Guaranty]." (Surreply at 4) In the absence of the non-existent express reservation, LaSalle also called the issue of a specific reservation "irrelevant." *(Id.* at 5) Second, the undisputed parts of LaSalle's Proof of Claim was not "partially settled." LaSalle's Proof of Claim against the estate is $60.1 million. The amount of the Nomura Settlement substantially exceeded that amount. While discrete elements of the Proof of Claim have been objected to, there is no "balance of the claim" for which another obligor might be responsible as there was in

39

*El Funding.*  The common law rule therefore applies to prevent LaSalle from making a double

recovery.  Doctors Hospital, allegedly liable for the several indivisible injuries to LaSalle (for

loan balance, criminal intent, and undisputed administrative expenses) was released by LaSalle

from those obligations along with Nomura and ASC.

### 2.    New York Law

New York law does not apply here because, just as Illinois law governs the more general

issue of double recovery, Illinois law governs whether a release of one joint obligor releases

another when their obligations rise from a single injury.  The choice of law provision in the

Settlement Agreement has no application here because it applies only to the parties to that

Settlement Agreement and only to disputes arising out of the negotiation, formation, and

construction of the Settlement Agreement.  Here there is no dispute at all relating to the

Settlement Agreement.  Here the issue is simply the *effect* of the release on a co-obligor who was

not a party to the agreement, so Illinois law applies.

In any event, "a choice of law or forum clause in a contract is not applicable to a non-

party." *Maldonado v. Creative Woodworking Concepts, Inc.,* 342 Ill. App.3d 1028, 1032 (3d

Dist. 2003).  *See also Am. Specialty Sys., Inc. v. Chicago Metallic Corp.,* No. 01 C 4609, 2002

WL 406965 (N.D. Ill. Mar. 15, 2002).

### C.    LaSalle's Release Operated  To Release Doctors Hospital From LaSalle's Claim Here

LaSalle argues that the state law rules relating to releases of co-obligors do not support a

determination that LaSalle has released its claim against Doctors Hospital. (LaSalle Supp. Br. at

8-11)  In doing so, however, LaSalle ignores the basic principle followed by Illinois courts and

does not even mention the most pertinent Illinois case, *Cherney v. Soldinger,* 299 Ill. App.3d

1066 (1st Dist. 1998). As Paloian showed in his initial supplemental brief, parties are considered

co-obligors where they are liable for a "single indivisible injury." It does not matter that their

liability for that injury arose from different types of legal obligations. *See id.* at 1074. So

LaSalle is wrong in saying that no release could occur because Doctors Hospital had "separate

and distinct rights and obligations." (LaSalle Supp. Br. at 7)  The test does not relate to the

nature or origin of the co-obligor's obligations; it relates to the releasor's "single indivisible

injury."  And, as Paloian has repeatedly shown in his briefs on this motion, LaSalle's recovery

from Nomura was for the same injury- its loss on the Nomura Loan  - that it seeks to remedy

by way of Doctors Hospital's  guaranty of that loan.

The only thing that LaSalle appears to say about the Illinois cases (identified only as the

"cases cited in the Supplemental  Briefing Order") is that they "arose  in tort" and that "cases

arising under the Joint Tortfeasor Contribution Act do not apply." (LaSalle Supp. Br. at 7)  But

that completely mischaracterizes the cases.  The court in *Cherney* specifically ruled that the

claim at issue there was not subject to the Contribution Act. 299 Ill. App.3d at 1071, 1074.

Accordingly, the court applied the common law rule that a release of one person liable for a

single injury to the releaser also operates as a release of a co-obligor. *Id.* at 1073-74.[7]

---

[7]  LaSalle cites to one New York federal court case, *RSL COM U.S.A., INC. v. Sollinger,* No. 99 civ.
9705(JSM), 2001 WL 336857 (S.D.N.Y. Apr. 5, 2001), which declined to apply a New York statute concerning release
of co-obligors because the parties' obligations "arose from separate transactions." Although that case involved an attempt
to avoid an indemnity obligation where a co-obligor had made only a partial payment on the obligation, it has no
application here in any event.  As Paloian has asserted, Illinois law and cases such as *Cherney*  are controlling here
(Paloian Supp. Br. at 5), and LaSalle has not contested that point.

41

**D.    The Intent Of The Parties Is Irrelevant Here, And
Even If It Were, The Settlement Agreement Does Not Express
An Intent To Preserve LaSalle's Claim Against Doctors Hospital**

LaSalle discusses various Illinois cases on release of joint tortfeasors, emphasizing that the intention of the parties to the release controls its scope and effect.  (LaSalle Supp. Br. at 8-11)  LaSalle then attempts to show that the Settlement Agreement expresses an intent that LaSalle would retain its claim on Doctors Hospital's guaranty.  *(Id.* at 11-15)  First, the cases concerning the parties' intent do not trump the prohibition on double recovery for a single injury.  Second, even if intent were relevant, the Settlement Agreement is silent on Doctors Hospital's guaranty.

**1.    The Cases On Intent Are Irrelevant**

The Illinois rule on release of co-obligors is based on a policy against double recovery. The case on which LaSalle places most emphasis, *Diamond Headache Clinic, Ltd. v. Loeber Motors, Inc.,* 172 Ill. App.3d 364, 369 (1st Dist. 1988), puts its plainly:  "The rationale for this doctrine is to prevent a claimant from receiving multiple recoveries for a single claim."  The intent of the parties therefore becomes relevant only under circumstances where no double recovery can occur, *i.e.,* where a claim is only partially settled or where a party has "sustained separate and different injuries." *Id.* at 369-70. But where, as here, LaSalle has suffered only one injury and it has been completely satisfied by the settlement with Nomura, the double recovery principle holds sway. And that is where *Cherney v. Soldinger, supra,* is so instructive.  The court there refused to permit a double recovery even though the basis of the co-obligor's liability was different than the released party's.   It was the single injury to the releasing party that mattered. Once that injury is remedied, as it has been here, the inquiry is at an end.

2.    **The Settlement Agreement Shows No Intent To
Preserve LaSalle's Claim On Doctors Hospital's Guaranty**

Even if the intent of the parties was relevant to the inquiry here, LaSalle has failed to

show that the Settlement Agreement reflects an intent to preserve LaSalle's claim on Doctors

Hospital's guaranty.   Where LaSalle formerly had claimed that some provisions of the

Settlement Agreement itself expressly preserved its claim against Doctors Hospital (Response to

Motion For Summary Judgment at 2, 4, 8, 11), LaSalle now bases its argument exclusively on

some language in Exhibit B to the Settlement Agreement, which is an agreed form of notice to

the certificateholders of the trust for which LaSalle is trustee.   LaSalle attempts to dress Exhibit

B up as if it were an express provision in the Settlement Agreement that LaSalle would retain its

rights against Doctors Hospital.   But, it is nothing of the sort.

First, Exhibit B was not "specifically incorporated" into the Settlement Agreement, as

LaSalle claims.   (LaSalle Supp. Br. at 4)   The word "incorporated" does not appear in the

agreement. Nor does "made a part hereof" or any similar language appear. The operative word

concerning Exhibit B, which is referenced in the context of an exception to the Settlement

Agreement's confidentiality provisions, is "attached:"

> (f) if disclosure is required by the PSA in the Party's reasonable
> judgment. LaSalle is expressly authorized to notify the
> Certificateholders of the D5 Trust regarding the terms of the
> settlement in th form *attached* hereto as Exhibit B by posting it on
> a secure password protected website.

(Settlement Agreement ¶ 6 (emphasis added))

Under New York law, an agreement to incorporate terms must be clear. *Ryan, Beck &

Co., LLC v. Fakih,* 268 F. Supp.2d 210, 222-23 (E.D.N.Y. 2003). *See also CooperVision, Inc. v.

Intek IntegrationTechnologies, Inc.,* 794 N.Y.S.2d 812, 819 (2005) (reference to extraneous

43

writing for particular purpose is part of agreement only for purpose specified). Although the

Settlement Agreement provides that New York law governs its construction, Illinois cases are

in accord with New York. For example, in the case cited by LaSalle, *188 LLC v. Trinity Indus.,*

*Inc.,* 300 F.3d 730, 736 (7th Cir. 2002) the court stated: "'For a contract to incorporate all or part

of another document by reference, the reference must show an intention to incorporate the

document and make it part of the contract.'" *Id.* (*quoting Wilson v. Wilson,* 217 Ill. App. 3d 844

(Ill. App. Ct. 1991)). Illinois requires that incorporation be clear and specific." *See also In re*

*Peregrine Fin. Grp., Inc.,* 487 B.R. 498, 506 (Bankr. N.D. Ill. 2013) (under Illinois law, "[m]ere

reference to another document is not sufficient to incorporate its terms into the contract.") The

Settlement Agreement, with its mere reference to Exhibit B, falls short of this standard.

Second, even if Exhibit B had been incorporated in the Settlement Agreement, it does not

show an intent that LaSalle would retain its claim on Doctors Hospital's guaranty. The language

does not reference Doctors Hospital's guaranty or any guaranty at all. It only references the

"Doctors Hospital loan," which is not a reference to a loan to Doctors Hospital, but to HPCH,

LLC, the owner of the real estate where the hospital operated. In fact, the "Doctors Hospital

Loan" is expressly defined in the Settlement Agreement as the loan to HPCH. (Settlement

Agreement, Recital No. 2) Exhibit B, therefore, could not constitute a reservation concerning

Doctors Hospital or its guaranty.

Other arguments of LaSalle were responded to adequately in the Paloian briefs.

44

## CONCLUSION

For the foregoing reasons, a Summary Judgment Order will enter on Count I adjudging and declaring that proceeds of the Nomura Settlement are to be credited as an offset against the LaSalle Proof of Claim filed against the bankruptcy estate.  Other Counts of the Counterclaim contesting certain elements of the Proof of Claim will be set for trial along with the Claim itself and further evidence will be taken to establish the net balance due on the Claim, if any, after crediting the offset.

ENTER:

_____
Jack B. Schmetterer
United States Bankruptcy Judge

Dated this 7th day of June 2013.

## CONCLUSION

For the foregoing reasons, a Summary Judgment Order will enter on Count I adjudging and declaring that proceeds of the Nomura Settlement are to be credited as an offset against the LaSalle Proof of Claim filed against the bankruptcy estate. Other Counts of the Counterclaim contesting certain elements of the Proof of Claim will be set for trial along with the Claim itself and further evidence will be taken to establish the net balance due on the Claim, if any, after crediting the offset.

ENTER:

_____
Jack B. Schmetterer
United States Bankruptcy Judge

Dated this 7th day of June 2013.

45