UNITED STATE BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: | |
| Doctors Hospital of Hyde Park, Inc., | |
| Debtor | |
| Gus Paloian, Chapter 11 Trustee of Doctors Hospital of Hyde Park, Inc., | |
| Counter-Claimant | Bankruptcy No. 00-bk-11520 |
| v. | Chapter 11 |
| LaSalle Bank National Association, f/k/a LaSalle National Bank, as Trustee for Certificate Holders of Asset Securitization Corporation Commercial Pass-Through Certificates, Series 1997, D5, by and through its servicer, ORIX Capital Markets, LLC, | Adversary No. 11-ap-1983 |
| Defendant | |

**OPINION ON TRUSTEE'S MOTION (DKT 137) TO ALTER OR AMEND ORDER
CERTIFYING FINAL JUDGMENT ENTERED JULY 10, 2012 ON COUNTS II, III & IV**

In the related Chapter 11 Bankruptcy case filed by debtor Doctors Hospital of Hyde

Park ("Debtor"), a claim was filed by LaSalle Bank National Association, f/k/a LaSalle

National Bank as Trustee for certain asset certificate holders of Asset Securitization

Corporation Commercial Mortgage Pass–Through Certificates, Series 1997, D5 ("LaSalle")

for $60,139,317.04 ("Claim"). On his objection to the Claim, a Motion for "Partial" Summary

Judgment was filed by the Chapter 11 Trustee Gus A. Paloian ("Trustee") seeking, among

other things, a declaration that LaSalle's Lien does not extend to settlement proceeds that

Trustee had recovered from some third parties.

A Memorandum Opinion issued on Trustee's Motion for Summary Judgment ("the

Opinion"), holding that LaSalle's lien on the assets of Doctors Hospital extended to

$3,380,000 recovered by the estate in settlement of certain claims. *Paloian v. LaSalle Bank

National Association,* 474 B.R. 576 (Bankr. N.D. Ill. 2012). Further background information

about the course of proceedings can be found in that Opinion. Final judgment was not

entered when the Opinion issued (Docket 48.) but was finally entered and certified for

immediate appeal on October 29, 2013. (Docket 133.)

Trustee now seeks partial reconsideration in his Motion to Alter or Amend under Rule 59, F.R. Civ. P., as made applicable by Rule 9023, F.R. Bankr. P. He seeks reconsideration of only one part of the Opinion, the conclusion that liens arising under the Security Agreement extend beyond the real estate to proceeds of Doctors Hospital's operations as a hospital. Specifically, Trustee argues that the term "Facility" in the Security Agreement refers solely to the real estate, and not to any assets owned by or proceeds generated by the hospital operating on the real property. Interpretation of language in the Security Agreement is found at Part A.2 of the Discussion section of the original Opinion. 474 B.R. at 587-90.

In 2002, Doctors Hospital filed an Adversary Complaint (the "2002 Adversary") pleading twenty-eight counts against a number of individuals and entities, including LaSalle Bank, seeking recovery for the bankruptcy estate of funds taken out of proceeds of Hospital operations on several theories.[1] 474 B.R. at 581. The settlement proceeds are at issue here because the claims and recoveries related to operations of the Doctor's Hospital pre-petition. *Id.* at 581-82. The parties do not dispute that the settlement proceeds

---

[1] The Complaint in the 2002 Adversary asserted against Daiwa that when Daiwa made a $25 million loan to MMA Funding, "Daiwa secured its loans to Doctors Hospital and/or MMA Funding by taking a security interest in, inter alia, the [Hospital] receivables and by implementing through the A/R Securitization Program a system of lockboxes," (¶ 44.) and that out of Hospital funds, "approximately $3,900,000.00 was used to retire the indebtedness of the entities other than Doctors Hospital," (¶ 46.) for the benefit of Desnick and other insiders (¶ 49.), and thus should be avoided as fraudulent transfers (Count XII), preferences (Count XIII) or post-petition transfers voidable under § 549 (Count XIV). The parties settled all Counts for a payment of $360,000. (00-bk-11520 Dkt. 1448 Exh. 9 at 6.)

Claims against Desnick and related parties in the 2002 Adversary complained of misuse of Hospital funds to carry out breach of fiduciary duty (Counts I-VI), fraudulent transfers (Counts VII, IX, X, XI, XXI, XXII, XXIV), preferences (Count XXIII), wrongful payment of dividends (Count XVIII, XIX, XX) and conversion (Count XXVII) allegedly for various purported loans (XXV) and various other transfers (Count XXVI). Desnick allegedly used his control of Doctors Hospital to pay MMA (another entity in his sole control) a management fee of $7.4 million, (¶ 81-86.), dividends to himself totalling $3.9 million in 1997 and 1998 (¶ 91-92.), purported loans totaling $4.6 million (¶ 94.), and "numerous transfers . . . by check and wire transfer" totaling $17.9 million. (¶ 95.) The parties settled all Counts for a payment of $6 million from Desnick, plus proceeds of the sale of a parking lot, and an assignment of insurance claims. (00-bk-11520 Dkt. 1448 Exh. 13 at 9.)

Doctors Hospital asserted against Webb, but did not allege in the 2002 Adversary that "Webb received approximately 3.8% of the rents paid by Doctors Hospital . . . or a total of approximately $60,000," (00-bk-11520 Dkt. 1448 Exh. 11 at 3.) "Webb also received approximately $1,767,000 in September 1997 representing the return of his limited partnership capital and a buyout of his interest in HPCH Partners," (*Id.* at 4) and these funds were paid to Webb using proceeds of the Nomura Loan, (*Id.*) which allegedly would have been recoverable by Doctors Hospital as fraudulent transfers. (*Id.* at 4.) The parties settled all claims for a payment of $270,000. (00-bk-11520 Dkt. 1448 Exh. 11 at 5.)

2

comprised "General Intangibles" of Doctors Hospital as defined in the Security Agreement, but Trustee argues that the Security Agreement does not extend to those forms and sources of "General Intangibles."

The present Motion to Alter or Amend Judgment/Order only pertains to the judgments entered in Adversary Counts II, III, and IV. The issue presented in Trustee's Motion is whether LaSalle's lien on Debtor's hospital "Facility" included only a lien on the building or also included a lien on proceeds of operations involved therein. Simultaneously with his motion to alter or amend judgment, Trustee filed a motion to stay enforcement of the Final Judgment Order until entry of final judgment on Counts I and XV, which are set for trial to begin on March 10, 2014. (Docket 135). That motion was granted (Docket 142.)

For reasons set forth below, Trustee's Motion to Alter or Amend will be denied by separate order.

## DISCUSSION

### Jurisdiction

This Adversary proceeding arises out of and relates to the Chapter 11 case of Doctors Hospital, No. 00 B 11520. Venue is proper in this District pursuant to 28 U.S.C. § 1409. Jurisdiction lies under 28 U.S.C. §§ 157(b)(2)(C) and (K) 4 and 1334 and District Court Internal Operating Procedure 15(a). The Counts implicated by the pending Motion comprise Counterclaims to the LaSalle Claim against the Bankruptcy Estate seeking determination of the extent and validity of liens supporting that Claim. Statutory "core" authority lies under 28 U.S.C. § 157(b)(2)(C) and (K) to finally adjudicate those Counts.

On November 14, 2011, the parties here were required to submit supplemental briefs on a bankruptcy judge's authority to enter final judgment in this Adversary proceeding in light of the Supreme Court holding in *Stern v. Marshall*, 131 S.Ct. 2594, 2620, 180 (2011). That order also called on the parties to state whether or not each consented to entry of final judgment by a bankruptcy judge on each Count in the event *Stern* is deemed to prohibit final judgment in absence of consent. In filings by the parties each did consent to entry of final judgment by a bankruptcy judge. (Docket 26 & 27)

The ability of parties to consent to final judgment by a bankruptcy judge in a core proceeding that is not constitutional under *Stern* has been questioned by a recent Seventh Circuit opinion, which held "that under current law a litigant may not waive an Article III, § 1, objection to a bankruptcy court's entry of final judgment in a core proceeding." *Wellness Int'l Network, Ltd. v. Sharif*, 727 F.3d 751, 773 (7th Cir. 2013). That holding in *Wellness*

3

has in turn been questioned in another Seventh Circuit opinion, which stated, "the issue in *Wellness International Network* was forfeiture rather than waiver," and thus the issue of express consent may not yet be finally decided in this circuit. *Peterson v. Somers Dublin Ltd.*, 729 F.3d 741, 747 (7th Cir. 2013). This issue is before the Supreme Court in *Executive Benefits Agency v. Arkison*, recently argued on January 14, 2014. 133 S.Ct. 2880 (granting *cert.*).

However the consent issue may finally be decided, that issue does not prevent entry of judgment by a bankruptcy judge on objections and counterclaims to a proof of claim. The authority of a bankruptcy judge to rule on objections to a creditor's proof of claim where necessary to determine the valid amount of the claim was clearly affirmed. *See Stern v. Marshall*, 131 S.Ct. 2594, 2616 (2011). Here, the adversary proceeding was filed in response to a court order directing that all objections to LaSalle's claim consisting of counterclaims as defined in F.R. Bankr. P. 3007(b) and 7001(2) were to be re-pleaded as separate counts in an adversary proceeding. The Trustee complied with that Order and filed the above-captioned twenty-nine count adversary counterclaim Complaint challenging LaSalle's Claim. This Motion to Alter or Amend concerns only Counts II, III and IV, and seeks ruling that LaSalle's lien does not extend to certain assets, and therefore it must necessarily be resolved in order to reach a ruling as to what if anything is actually due on LaSalle's filed and pending proof of secured claim.

### Entry of Summary Judgment Against Trustee Was Proper

The judgment against Trustee at issue here entered in proceedings beginning on Trustee's own motion for summary judgment, an unusual though well-recognized procedural consequence. Rule 56(f) (F.R.Civ. P. as made applicable by F.R. Bankr. P. 7056), allows courts to enter summary judgment for nonmovants, as was done here. "When there are no issues of material fact in dispute, a district judge may grant summary judgment in favor of the non-moving party or may grant summary judgment even though no party has moved for summary judgment." *Jones v. Union Pac. R. Co.*, 302 F.3d 735, 740 (7th Cir. 2002); *See* 10A Wright & Miller, Federal Practice and Procedure § 2720. The Trustee has made no objection to the procedure whereby his motion resulted in as a judgment for LaSalle.

### Altering or Amending the Judgment is Not Warranted Under Rule 59(e)

The legal standard under F.R. Civ. P. 59(e) (made applicable through F.R. Bankr. P. Rule 9023) requires that, "the movant must present either newly discovered evidence or

4

establish a manifest error of law or fact." *Oto v. Metropolitan Life Insurance Co.*, 224 F.3d 601, 606 (7th Cir. 2000). A "Rule 59(e) motion should be granted if there exists 'a manifest error of law or fact,' so as to enable 'the court to correct its own errors and thus avoid unnecessary appellate procedures.' *Divane v. Krull Elec. Co., Inc.*, 194 F.3d 845, 848 (7th Cir. 1999) (quoting *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir.1996)). But, "a 'manifest error' is not demonstrated by the disappointment of the losing party. It is the 'wholesale disregard, misapplication, or failure to recognize controlling precedent.'" *Id.* A trial court properly rejects a motion under Rule 59(e) when the motion merely rehashes old arguments. *Id.* Such a motion is proper only when it is demonstrated that "the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983).

Trustee asserts that a "manifest error" was made here in the earlier Opinion in not recognizing a contradiction between (a) the definition of the term "Facility" in the Security Agreement as limited to the real property on which Doctors Hospital operated, and (b) reasoning in the Opinion that "this does not mean that LaSalle's lien is limited only to the brick and mortar of the Facility." This is the same argument Trustee made in his briefing on summary judgment. He now re-argues that the term "Facility" covered by the Bank's lien means little more than the bricks and mortar, and further, that the Court erred by considering the term "Inventory" in construing the parties' intent under the Security Agreement. The same arguments were earlier raised by the Trustee in his Memorandum in Support of Summary Judgment (Bankruptcy Case Docket No. 1447) at pages 7-9; and more fulsomely in his Reply brief (Bankruptcy Case Docket No. 1466) at pages 2-9. In the Reply brief, the Trustee argued that the language "relating to the Facility" must limit the lender's lien to something less than all of the hospital's assets as an operator of a hospital. He further argued that finding a broad grant of a security interest would read something into the definition of "Facility" that "flies in the face of" having a precise definition of the "Facility" in the Security Agreement. The earlier Opinion discussed and found the Trustee's arguments not convincing. 474 B.R. at 590. In his Motion to Alter or Amend, Trustee argues once more at length for finding a narrow grant of security based on the narrow definition of the term "Facility." As discussed further below, that argument continues to lack merit. Trustee also argues that certain documents executed between the lender and

HPCH (the owner of the real estate, for which Doctors' Hospital was the guarantor) are relevant in interpreting language of the Security Agreement executed by Doctors' Hospital.

Both of these arguments were fully considered and rejected in the earlier Opinion. When LaSalle advanced the argument that documents other than the Security Agreement should be examined in determining the extent of LaSalle's lien, that argument was also rejected. *Id.* at 586-87. Trustee's argument now for examining extrinsic documents likewise lacks merit.

### There Was no Error

No error was shown in the earlier Opinion. The Security Agreement, in Paragraph 2 provided:

> The Operator hereby grants . . . as security for Operator's interest in and to the following, and any property as to which a security interest may be created or perfected relating to the Facility . . .
>
> . . . (a) *All Inventory,* fixtures relating to the Facility, Equipment, Permits, Licenses, *General Intangibles,* Instruments, Accounts, Account Collateral, Leases, Money, investment properties relating to the Facility, rights to proceeds of letters of credit relating to the Facility and goods, now existing or hereafter arising or acquired (other than Permits and Licenses which by their terms or applicable law prohibit a collateral assignment thereof); . . ."

All "Inventory" and all "General Intangibles" were thereby subject to securitization in favor of the bank.

While Paragraph 2 of the Security Agreement contained the grant of collateral interest to LaSalle, Paragraph 1 of the Security Agreement defined some terms used in Paragraph 2. The language in Paragraph 2 of the Security Agreement is therefore further clarified by definitions assigned to those words. The term "Facility" "has the meaning set forth in the Recitals of this Security Agreement." Those Recitals provided that the "Facility" consisted of the "improved real property described on Exhibit A attached hereto . . . together with all easements, rights of way and other property rights appurtenant thereto and all Equipment attached to, located at or otherwise used in connection with the foregoing . . . which . . . has a street address 5800 South Stony Island Avenue, Chicago, Illinois 60637–2099." Exhibit A to the Agreement contained the legal description of the Facility. 474 B.R. at 587. However, the operations of Doctors Hospital were "related to" the Facility even if when these operations were not strictly confined to just the physical Facility. In his Reply Memorandum on summary judgment, the Trustee argued that the Security Agreement made a distinction between operations of the Facility and operations

6

related to the Facility. In his Motion to Alter or Amend, Trustee again argues that the
building itself operated independently of the hospital services operating on and within it.

The Security Agreement as a whole supports the conclusion that a security interest
was granted in more than the bricks and mortar. The Opinion further supported its
interpretation of a broad grant of a security interest by examining the Agreement's use of
the term "Inventory," reasoning, "Trustee's interpretation of the Security Agreement would
render meaningless the grant of the hospital's inventory as collateral. Real property and
the physical structure on it do not generate inventory." 474 B.R. at 590.

The Security Agreement defines that the term "General Intangibles" to include:

> . . . all of Operator's "general intangibles," as such term is defined in the UCC
> *relating to the Facility*, and, to the extent not included in such definition, all
> intangible personal property *of Operator with respect to the Facility* (other
> than Accounts, Rents, Instruments, Inventory, Money and Permits),
> including, without limitation, all Receivables, Financing Proceeds, *things in
> action, settlements, judgments, contract rights, rights to performance*
> (including, without limitation, rights under warranties) refunds of real estate
> taxes and assessments and other rights to payment of Money, copyrights,
> trademarks, trade names andpatents now existing or hereafter in existence.

(Security Agreement at 4-5, emphasis supplied.)

LaSalle's liens were and are found to extend to all "General Intangibles" that are
"with respect to the Facility," (except tort claim discussed in the prior Opinion, 474 B.R. at
590) which necessarily included the settlement proceeds from non-tort lawsuits charging
misuse of funds arising from operations of the Hospital. The liens therefore extended to the
settlement proceeds involved here.

The earlier Opinion also discussed at length why the Security Agreement's
treatment of "Inventory" as covered by the lien leads to the conclusion that the lien
necessarily reaches beyond the bricks and mortar to proceeds of the hospital operations.
474 B.R. at 587. "Inventory" was defined as:

> "Inventory " means all of Operator's "inventory," as such term is defined in
> the UCC, relating to the Facility, and, to the extent not included in such
> definition, all goods now owned or hereafter acquired by Operator with
> respect to the Facility intended for sale or lease, or to be furnished under
> contracts of service by Operator for sale or use at or from the Facility, and all
> other such goods, wares, merchandise, and materials and supplies of every
> nature owned by Operator with respect to the Facility and all other such
> goods returned to or repossessed by Operator with respect to the Facility.

(Security Agreement at 4-5.)

7

That broad grant of security is further buttressed by the Security Agreement's treatment of the term "Equipment." The Security Agreement defined "Equipment" as follows:

> "Equipment" means all of Operator's "equipment," as such term is defined in the UCC, relating to the Facility, and, to the extent not included in such definition, all fixtures, appliances, machinery, furniture, furnishings, decorations, tools and supplies, now owned or hereafter acquired in connection with the Facility, including but not limited to, **all beds, linens,** radios, televisions, carpeting, telephones, cash registers, computers, lamps, glassware, restaurant and kitchen equipment, **all medical, dental, rehabilitation, therapeutic and paramedic equipment and supplies,** any building equipment, including but not limited to, all heating, lighting . . . air cooling and air conditioning apparatus . . .

(Security Agreement at 4. (emphasis added)). Not only does the definition of "Equipment" specifically include equipment necessary for operating a hospital, including beds, linens, and medical equipment, but it also separately enumerates equipment necessary for operating the building itself. Thus, Trustee's argument that the earlier Opinion misread the Security Agreement by extending it beyond the operation of the real estate is unconvincing. The words used in the Security Agreement clearly contemplated both operation of the hospital and the real estate it operated out of.

Further, Paragraph 3.2 of the Security Agreement speaks of "financing or leasing of the Equipment and vehicles described on the attached Exhibit F" and Paragraph 3.13 speaks of "its obligations for purchase money indebtedness and capitalized leases as described on Exhibit F." Exhibit F listed, *inter alia,*

> › Laboratory equipment from Baxter Scientific
> › Oxygen Equipment
> › Ultrasound Equipment
> › A Systec CT System from GE Medical Systems
> › ICU Monitors
> › A Mamography unit
> › A Bronchoscope and related equipment.

(Security Agreement at 48.)

If, as Trustee asserts, the language in the Security Agreement relating to "Inventory" were read merely to encompass a variety of materials, tools, and supplies necessary for the everyday maintenance and upkeep of the real estate, that argument would have to extend as well to "Equipment" (which is treated similarly in the Security

8

Agreement). Any equipment specifically covered would not encompasses specific medical equipment as well. Trustee's interpretation fails to explain how all of the classifications of collateral with specific references to medical equipment necessary to the operation of a hospital would have any meaning other than as reasoned in the earlier Opinion.

The foregoing provisions are inconsistent with a reading that if "relating to the Facility" meant only the bricks and mortar were covered by the lien rather than including the lien on the hospital operations. Where a contract as a whole makes clear the overall intention of the parties, courts examining isolated provisions should choose that construction which will carry out the plain purpose and object of the agreement. *Lockheed Martin Corp. v. Retail Holdings, NV.*, 639 F.3d 63, 69 (2d Cir. 2011). Here, the contract as a whole made clear that the parties' overall intention was to grant a broad security interest in Debtor's assets "relating to the Facility." The narrow definition of the term "Facility" as set forth in the Recitals of the Security Agreement must be read in conjunction with the plain purpose and object of the entire Agreement.

## The Security Agreement Contained No Ambiguity

Trustee argues in the alternative that the Security Agreement was ambiguous and thus summary judgment was improper. The Opinion found that the Security Agreement was unambiguous and the Trustee has not shown here that it contained any ambiguity. As explained in the Opinion, (474 B.R. at 586), a contract is not ambiguous because the parties can offer competing interpretations of its terms. *Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir.2009). Whether a contract is ambiguous is a question of law. *Id.* Contract terms are ambiguous only if a reasonably intelligent person viewing the terms objectively could interpret the language in more than one way. *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir.2008). Viewed objectively under that test, the terms of the Security Agreement are unambiguous.

9

## Conclusion

Trustee's Motion fails both because it does not meet the standard for altering judgment under Rule 59, and because it does not succeed on the merits. For foregoing reasons, Trustee's Motion to Alter or Amend Judgment will be denied by separate order.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this 27th day of January 2014